Leslie Jolley

321 Wende Court

Glen Burnie, MD 21061

leslie.jolley@yahoo.com

(410) 790-3837

District Director Karen McDonough

801 Market St. Suite 1000

Philadelphia, PA 19107

February 6, 2026

RE: "Section 83 Request" for Charge No. 531-2024-04332

    For Catholic Charities

I am writing in response to the position statement submitted by Catholic Charities regarding the above-referenced charge. I, Leslie Jolley, am representing myself in this matter and assert that Catholic Charities discriminated against me since my disability and retaliated against me for requesting a reasonable accommodation.

Background and Timeline

On January 25, 2024, I met with Antoinette Hofer-Coefs Ann regarding my accommodation request. At that time, Catholic Charities reviewed my resume and past applications to determine internal roles I might fill, ultimately offering me an Administrative Assistant position at the Gallagher location. This role came with a salary reduction—from $60,000 to $52,514—and required me to commute an additional 25–30 miles one way, depending on traffic. I accepted this

Now that I've sought accommodations due to medical necessity, I've been mischaracterized as manipulative. This is deeply distressing and unfair.

Additional Concerns

There were multiple instances where I was asked to manage short staffing without support, while my manager, Tanya Ritter, was unavailable—even during emergencies. She often stated she could not be reached on Sundays due to her church commitments. She once offered a staff member $100 via Cash App to cover a shift, which I was not allowed to do. While I struggled to find staff coverage, these types of inconsistencies demonstrate poor managerial support and a double standard in enforcement of policies.

I also witnessed systemic issues, including:

• Homes being overburdened with clients needing intensive care without adequate staff.

• Faced with pressure to take on shifts even when restrictions are in place and proper accommodation is lacking.

• Staff being bribed with meals and money to work, while I was denied similar flexibility.

Conclusion

Catholic Charities failed to engage in a proper interactive process when I requested accommodations for my disability and instead reassigned me to a lower-paying, physically demanding role that aggravated my medical condition. I was not reinstated when my restrictions were lifted, nor was I given a fair opportunity to return to my original position.

Additionally, I was subjected to retaliatory actions and unfounded write-ups that have damaged my professional record and personal integrity.

I respectfully request that the EEOC consider these facts in support of my claim. I am available for further clarification.

Sincerely,

Leslie Jolley

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Baltimore Field Office**
31 Hopkins Plaza, Suite 1432
Baltimore, MD 21201
(410) 801-6685
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 12/15/2025

**To:** Mrs. Leslie F. Jolley
321 Wende Ct
GLEN BURNIE, MD 21061
Charge No: 531-2024-04332

EEOC Representative and phone:   Legal Unit Representative 267-589-9707

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 531-2024-04332.

On behalf of the Commission,

Digitally Signed By: Karen McDonough
12/15/2025

Karen McDonough
Acting Director

**Cc:** Sydney Fortmann, Esq.
Gallagher, Evelius, & Jones

Please retain this Notice for your records.

Enclosure with EEOC Notice of Closure and Rights (05/25)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 531-2024-04332 to the District Director at Karen McDonough, 801 Market St Suite 1000, Philadelphia, PA 19107.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 531-2024-04332 to the District Director at Karen McDonough, 801 Market St Suite 1000, Philadelphia, PA 19107.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

### NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- ✓ **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- ✓ In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- ✓ **Only one** major life activity need be substantially limited.
- ✓ Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

- **are not considered** in determining if the impairment substantially limits a major life activity.
- ✓ An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- ✓ An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- ✓ "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- ✓ The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- ✓ A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

*Note: Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability. For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.*



Sydney L. Fortmann
Direct Dial: 410.951.1406
sfortmann@gejlaw.com

March 27, 2025

**VIA RESPONDENT PORTAL**
Investigator Michael Faison
U.S. Equal Employment Opportunity Commission
Baltimore Field Office
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1432
Baltimore, Maryland 21201

      Re:    *Leslie Jolley v. Catholic Charities*
                EEOC No. 531–2024–04332

Dear Investigator Faison:

      This firm represents Associated Catholic Charities, Inc. ("Catholic Charities") in connection with the above-referenced Charge of Discrimination (the "Charge") filed by Leslie Jolley.[1] This letter represents Catholic Charities' Position Statement in response to Ms. Jolley's Charge.

      Ms. Jolley claims that Catholic Charities discriminated against her based on her disability and retaliated against her after she allegedly requested a reasonable accommodation. Catholic Charities never discriminated or retaliated against Ms. Jolley. In fact, throughout her six years of employment, Catholic Charities has worked with Ms. Jolley on multiple occasions through various medical leaves and requests for reasonable accommodations. Most recently, as of January 2024, Ms. Jolley asserted that she had lifting restrictions that rendered her unable to fulfill the essential functions of her position. Through an interactive process with Ms. Jolley, Catholic Charities carefully considered Ms. Jolley's restrictions, accommodated those restrictions, and allowed her to transfer to the Administrative Assistant position that Ms. Jolley wanted. However, Ms. Jolley later admitted to Catholic Charities that she had misrepresented those restrictions to obtain her desired transfer and that her doctor had released her from those restrictions prior to her transfer to the Administrative Assistant position. Although Ms. Jolley now alleges discrimination and retaliation, she in fact drove the interactive process with Catholic Charities to such a degree that she intentionally misled Catholic Charities about her restrictions so that she could get the position that she wanted. Regrettably, this conduct is in line with a history of dishonest behavior and misrepresentations by Ms. Jolley during her employment with Catholic Charities. Catholic

---

[1] Ms. Jolley's Charge is untimely and should be immediately dismissed. In Maryland, an individual has three hundred (300) days from the date of alleged harm to file a charge of discrimination with the Equal Employment Opportunity Commission (the "Commission"). 42 U.S.C. § 2000e–5(e)(1); *Valderrama v. Honeywell Tech. Sols., Inc.*, 473 F.Supp.2d 658, 662 n.4 (D. Md. 2007). In her Charge, Ms. Jolley claims that the last date of alleged discrimination occurred on January 30, 2024. Three hundred ten (310) days separate that date and December 5, 2024, when Ms. Jolley filed her Charge with the Commission.

# GALLAGHER
GALLAGHER EVELIUS & JONES
ATTORNEYS AT LAW

Leslie Jolley
March 27, 2025
Page 2

Charities never discriminated or retaliated against Ms. Jolley, and respectfully requests that her Charge be dismissed.

Catholic Charities originally hired Ms. Jolley as a Direct Support Professional (DSP) at Gallagher Services, a residential housing program for adults with intellectual and developmental disabilities, on July 23, 2018. Ms. Jolley later progressed through The National Alliance for Direct Support Professionals (NADSP) program, achieving the NADSP I and NADSP II certifications by June 2022. Shortly thereafter, Catholic Charities promoted Ms. Jolley to Manager of Community Living II. As part of her position, in addition to the job duties of a DSP, Ms. Jolley was also responsible for managerial duties, which included scheduling staffing for three Gallagher Services homes to provide care for clients and ensuring that the state-mandated ratios of employees to clients were continuously met.

Unfortunately, throughout her employment with Catholic Charities, Ms. Jolley has exhibited a pattern of manipulating schedules and policies to best suit her personal desires rather than the needs of Catholic Charities and the vulnerable population it serves. For example, in March 2023, Ms. Jolley's supervisor, Tanya Ritter-Egbe (Director of Residential Services South, Gallagher Services) learned that Ms. Jolley was purposely not scheduling staff for shifts at her assigned homes so that she could work those shifts herself to make more money, even when staff was available, and also submitting for pay for shift work when the homes had enough staff working at that time without her. *See* Exhibit A (March 10, 2023 Email of Tanya Ritter, Antoinette Cofer-Hoefs, and Kathy Clemente).

Ms. Jolley also prioritized her own convenience over the job responsibilities of those who reported to her. In September 2023, a staff member was scheduled to complete required training so that she could maintain her certification to act as a Certified Medication Technician (CMT). *See* Exhibit B (September 7, 2023 Emails of Tanya Ritter and Antoinette Cofer-Hoefs). When Ms. Ritter-Egbe later learned that the staff member had missed the required training (meaning her certification had lapsed) because she instead had worked a typical shift that day, Ms. Ritter-Egbe asked Ms. Jolley to explain what happened. Ms. Jolley replied, "She and I both forgot about her class and Yes i *[sic]* needed her to work." *See id.* Ms. Ritter-Egbe then spoke directly with the staff member, who reported that Ms. Jolley affirmatively told her not to attend the training because she needed to work a shift and that the staff member was unwilling to confront Ms. Jolley about the situation due to fear of retaliation.

In August 2023, Ms. Jolley again discounted her fellow colleagues and the individuals Gallagher Services serves when she inappropriately solicited a colleague to complete her own job responsibilities, including picking up a resident from the airport (which entails securing parking in one of the airport parking garages, physically entering the airport, obtaining a gate pass, meeting the resident at the arrival gate upon deplaning, and transporting the resident out of the airport and

# GALLAGHER
GALLAGHER EVELIUS & JONES
ATTORNEYS AT LAW

Leslie Jolley
March 27, 2025
Page 3

back to the home), even when Ms. Jolley was available to do her job and the colleague holds a completely different position (Quality Enhancement Coordinator) from Ms. Jolley. In that instance, Ms. Jolley told the colleague that it was the colleague's "job to help" and that she "should be able to" do Ms. Jolley's job. However, Ms. Jolley was never the colleague's supervisor and did not discuss the matter with her own supervisor or her colleague's supervisor as she should have according to the appropriate procedure for finding coverage. The following day, Ms. Jolley again contacted the colleague to demand that the colleague pick up a shift at one of Ms. Jolley's assigned homes, although the colleague was no longer doing residential shift work. The colleague was concerned with Ms. Jolley's failure to follow the proper procedure for obtaining assistance in those instances and raised her concerns with her own supervisor, who then communicated with Ms. Ritter-Egbe. Ms. Jolley had also previously told Ms. Ritter-Egbe that the colleague was going to take care of the accounting for one of Ms. Jolley's assigned homes, although the colleague had declined Ms. Jolley's request to do so without first speaking to her supervisor. *See* Exhibit C (August 16-17 Emails of Allison Evans, Megan Sweat, and Tanya Ritter).

A few short months later, on October 2, 2023, Ms. Jolley received final performance counseling after she failed to report an automobile accident, per Catholic Charities policy, in which she was driving a Catholic Charities vehicle when she collided with another staff member's vehicle. Although the collision took place on June 13, 2023, Ms. Jolley did not report the accident to her supervisor until September 12, 2023, three months later, causing a significant delay in required repairs to the other staff member's vehicle. *See* Exhibit D (October 1, 2023 Final Warning). Although these more serious examples are representative of Ms. Jolley's dishonest and self-serving behavior, this behavior has also been evident in Ms. Jolley's employment on a smaller, day-to-day basis. *See, e.g.,* Exhibit E (November 27, 2023 Email of Tanya Ritter-Egbe) (describing an instance where Ms. Jolley told her manager that she was going to leave a meeting early to cover a staff shortage at one of her assigned homes but then never reported to the home that day, leaving the home out of the state-mandated ratio of employees to clients).

On December 1, 2023, Ms. Ritter-Egbe received an automatic response email from Ms. Jolley stating that she would be out of the office from December 4 to December 19 and instructing email recipients to contact Ms. Ritter-Egbe for assistance, although Ms. Jolley had not notified anyone at Catholic Charities (including Ms. Ritter-Egbe) regarding her intended absence. *See* Exhibit F (December 1, 2023 Email from Tanya Ritter). Ms. Jolley did not report for work for two days, without notifying her supervisor or anyone else at Catholic Charities, and then submitted a doctor's note (that did not indicate an emergent need for leave such that Ms. Jolley could not provide notice to Catholic Charities regarding her absence) on the third day that she was absent from work. Even without Ms. Jolley following proper call-out procedures, Catholic Charities excused Ms. Jolley's absence and began working to accommodate her leave. This was not the first time that Ms. Jolley required medical leave and/or accommodations during her employment with Catholic Charities. For example, Catholic Charities had previously accommodated Ms. Jolley and



Leslie Jolley
March 27, 2025
Page 4

provided her with medical leaves of absence from August 10, 2020 to November 1, 2020; from April 5, 2022 to May 17, 2022; from October 16, 2023 to November 21, 2023. Here, again, Catholic Charities provided Ms. Jolley with medical leave from December 1, 2023 to December 27, 2023. *See* Exhibit G (Leslie Jolley Employment Status History).

Later that month, Ms. Jolley submitted another doctor's note that described her need for certain restrictions, including lifting restrictions, until re-evaluation on May 1, 2024. Ms. Raul, Ms. Clemente, Ms. Cofer-Hoefs, Karen Funk (Benefits Manager), and Darcy Boegner (Director of Talent Management) worked internally to identify possible accommodations for Ms. Jolley's restrictions. *See* Exhibit H (December 26, 2024 Emails of Jennifer Raul, Kathy Clemente, and Antoinette Cofer-Hoefs); Exhibit I (1/22/2024 Meeting Notes). Ms. Jolley's restrictions did not allow for her to lift more than 40 pounds, although an essential function of her current position (related to client safety) was lifting up to 75 pounds. Ms. Cofer-Hoefs, Ms. Funk, and Ms. Boegner then met with Ms. Jolley to discuss interactively her restrictions and possible accommodations, including transfer to other available positions. *See* Exhibit J (Notes re: Meeting with Leslie Jolley 1/25/2024). Together, they discussed the chronic nature of Ms. Jolley's disability and the importance of ensuring her safety as well as the safety of the individuals Gallagher Services serves. They specifically discussed the lower pay[2] associated with the available position of Administrative Assistant that could accommodate her restrictions, and Ms. Jolley indicated her understanding of the pay differential and desire to transfer to the available position. Based on their discussion, Ms. Jolley transferred to the role of Administrative Assistant, which had no relevant lifting requirements, on January 30, 2024 and officially started on February 5, 2024. *See* Exhibit K (January 25, 2024 Letter to Leslie Jolley).

Some months later, on April 18, 2024, Ms. Jolley requested that she be permitted to pick up additional hours as a Direct Support Professional (DSP) in addition to her hours as an Administrative Assistant. *See* Exhibit L (May 28, 2024 Final Warning). When reminded of her restrictions and that the DSP position required the ability to lift up to 75 pounds, Ms. Jolley asserted that she had been cleared to lift 75 pounds before her transfer to the Administrative Assistant role. Then, on May 23, 2024, Ms. Jolley submitted a doctor's note that removed her lifting restrictions. However, the doctor's note showed inconsistent dates: the note itself was dated January 30, 2024, representing that Ms. Jolley's lifting restrictions had actually been removed on that date (prior to her transfer to the Administrative Assistant role) but the doctor's signature on the note was dated May 22, 2024. *See* Exhibit M (June 28, 2024 Letter to Leslie Jolley). When asked to explain the date inconsistency, Ms. Jolley again admitted that her doctor actually had removed her lifting restrictions in January prior to her meeting with Ms. Cofer-Hoefs, Ms. Funk, and Ms. Boegner in

---

[2] Ms. Jolley's annual salary as a Manager of Community Living, an exempt position, was $60,569.73. Ms. Jolley's pay as an Administrative Assistant, which is a nonexempt position in which Ms. Jolley was eligible for overtime pay, was $25.1282 per hour. Ms. Jolley made approximately $160.00 per week less as an Administrative Assistant, although the pay differential was less in weeks when she worked overtime hours.

# GALLAGHER
GALLAGHER EVELIUS & JONES
ATTORNEYS AT LAW

Leslie Jolley
March 27, 2025
Page 5

which Ms. Jolley had continued to assert her need for accommodations based on those lifting restrictions and the group discussed how Catholic Charities could accommodate her restrictions. Ms. Jolley also said, "I had to get out of there," in reference to her previous position as Community Living Manager to further explain why she continued to act as though the lifting restrictions applied to her after her healthcare provider had lifted those restrictions. On May 28, 2024, Ms. Jolley received a Final Warning based on the misrepresentation regarding her lifting restrictions. *See* Exhibit L.

In October 2024, Ms. Jolley sustained an injury at work when she fell up a flight of stairs. Ms. Jolley has been on leave since that date, continuing through today. Her most recent communication with Catholic Charities included medical documentation stating a need for leave until April 7, 2025. *See* Exhibit N (January 13, 2025 Email of Alyscia Smith). Ms. Jolley exhausted all paid and unpaid leave available to her on January 27, 2025. *See* Exhibit O (January 13, 2025 Email of Jennifer Raul).

Throughout her employment, Catholic Charities provided Ms. Jolley multiple medical leaves and repeatedly worked with her to provide accommodations related to her medical restrictions, including with regard to her chronic condition. However, for her part, Ms. Jolley continued to claim a need for lifting restrictions <u>after</u> her doctor had released her from those restrictions (months prior) in order to facilitate her own transfer to an Administrative Assistant position, all because she no longer wished to work as a Manager of Community Living at Gallagher Services. Catholic Charities engaged in continued interactive conversations with Ms. Jolley to discuss her restrictions, evaluate potential accommodations, and provide her with a position that accommodated her restrictions. Ms. Jolley claimed her need for lifting restrictions related to her chronic condition, requested Catholic Charities accommodate the restrictions, agreed to transfer to a different position that could accommodate the restrictions, and then, regrettably, later admitted that her doctor had released her lifting restrictions prior to her job transfer and that she had continued to claim her need for the restrictions just because she wanted to switch jobs within Catholic Charities. After misrepresenting her medical needs and restrictions in order to get herself a new position at Catholic Charities, Ms. Jolley cannot now claim that Catholic Charities discriminated or retaliated against her by transferring her to the position she desired, especially when the transfer only took place due to Catholic Charities' incorrect understanding, based on Ms. Jolley's own misrepresentations, that Ms. Jolley required certain accommodations related to her medical restrictions.

Ms. Jolley was never demoted nor denied a reasonable accommodation, contrary to the allegations in her Charge. In fact, from the time that Ms. Jolley transferred to the Administrative Assistant position to the time that Catholic Charities learned she had been released from her lifting restrictions, Ms. Jolley's original Manager of Community Living position remained open. She could have returned to that position, which remained available to her, at any time (and which would



Leslie Jolley
March 27, 2025
Page 6

have benefited Catholic Charities greatly as it navigated a staffing shortage), but she never requested to do so. Ms. Jolley has exhibited a clear disregard of the importance and legitimacy of reasonable accommodations and the interactive process for employees with medical needs, including when she discounted the medical needs and documented restrictions of an employee who reported to her. On July 26, 2023, Jennifer Raul (Leave Management and Compliance Specialist) received a complaint from one of the employees who reported to Ms. Jolley. The employee, who receives accommodations from Catholic Charities for various medical needs, complained that she had not been able to administer her medication properly because Ms. Jolley failed to properly schedule staffing and coverage for the home where the employee worked. *See* Exhibit P (July 26, 2023 Email to Jennifer Raul).

In summary, Catholic Charities has continually engaged and interacted with Ms. Jolley to accommodate her medical restrictions, efforts which have included providing Ms. Jolley with multiple leaves of absence during her employment (such as from August 10, 2020 to November 1, 2020; from April 5, 2022 to May 17, 2022; from October 16, 2023 to November 21, 2023; from December 1, 2023 to December 27, 2023; and from November 4, 2024 through today's date). *See* Exhibit G. In return, Ms. Jolley misrepresented her need for certain restrictions so that she could move to a different position at Catholic Charities that she desired more than her previous position even after her doctor had released her from the restrictions. Incredibly, Ms. Jolley admitted to misrepresenting such to both her Human Resources Business Partner and the Director of Talent Management at Catholic Charities and further admitted that she misrepresented her lifting restrictions to Catholic Charities because she actually just wanted to be an Administrative Assistant rather than continue working in her previous role. Although Ms. Jolley drove the interactive process to such a degree that she lied about her medical restrictions to get the position that she wanted at Gallagher Services, she now purports to allege that Catholic Charities somehow discriminated and retaliated against her by providing her with a transfer to the position that she herself wanted. Ms. Jolley's claims that she was discriminated and retaliated against in her employment are without support and should be dismissed. Catholic Charities has never discriminated or retaliated against Ms. Jolley, and therefore respectfully requests that the Commission determine there is no probable cause to believe it engaged in unlawful discrimination or retaliation against Ms. Jolley in any case.

Sincerely,

*Sydney Foster*

Sydney Peterson Fortmann